FILED
03 JUN 12 PM 3:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | | |
|---|---|---|
| TINA M. CHAPA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | |
| | ) | 02-AR-1009-M |
| GADSDEN STATE COMMUNITY COLLEGE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ENTERED
JUN 12 2003

MEMORANDUM OPINION

Before the court is a motion by plaintiff, Tina M. Chapa ("Chapa"), to dismiss some of her claims and a motion for summary judgment by defendants, Gadsden State Community College ("GSCC"), President Renee Culverhouse ("Culverhouse") and James Mackey ("Mackey")(collectively "defendants"). Chapa's complaint sets forth the following nine claims: an equal protection race and gender discrimination claim, discrimination based on race or color under 42 U.S.C. § 1981, discrimination based on race and gender under Title VII, violation of her First Amendment freedom of association rights and freedom of speech rights, discrimination based on sex and gender under Title IX, pay discrimination based on sex and gender under the Equal Pay Act ("EPA"), retaliation and retaliatory discharge under Title VII and Title IX, 42 U.S.C. § 1981, EPA, and the First and Fourteenth Amendments, and the Alabama common law tort of invasion of privacy against defendant Mackey. Chapa is voluntarily dismissing her claims under the EPA, her claims under Title VII and Title IX against both individual defendants from her Title VII and Title IX claims, all claims for damages against GSCC and the individual





defendants in their official capacities as to her claims brought under 42 U.S.C. § 1983. Her claim under 42 U.S.C. § 1981 are merged into her claims under 42 U.S.C. § 1983 as a matter of law. Thus, her separate § 1981 claim is dismissed.

Statement of Undisputed Facts

Chapa, a white female, became employed by GSCC on September 1, 1998. She worked as a security officer, first working in the dormitories and then on patrol. She worked the third shift from 10 p.m. until 6 a.m. Initially, Chapa was a part-time employee. She was elevated to full-time status effective December 6, 1999. She became full-time only after she had filed a EEOC charge alleging race and gender discrimination. As a full-time employee, Chapa was required to complete a three-year probationary period before obtaining tenure. If she had remained employed by GSCC, she would have obtained tenure in December 2002.

Mackey was Chapa's supervisor and head of GSCC's Security Department. Mackey completed formal performance evaluations on Chapa's work in 2000 and 2001. Both evaluations rated her job performance in 15 categories; Mackey scored Chapa as "good," the second highest rating possible. During Mackey's supervision of Chapa he never disciplined her.

Early in her employment, Chapa was asked by Mackey whether he was going to have to worry about her becoming pregnant. Chapa was also offended by Mackey's regular use of racial and ethnic slurs at work, such as "nigger," "chink," "sand monkey" and "ricehead" when referring to students and employees of GSCC. Chapa felt particularly insulted and personally affronted by his repeated references to her friends as "that black nigger," "that nigger in the pink truck" and "that f–king nigger." He once told Chapa that she could be fired if he saw her talking to Mitchell James, one of her black friends. He also told her it was not right for a white woman to

be associating with a "nigger." Chapa is married to Andrew Chapa, who is of Hispanic descent. Mackey met Chapa's husband on at least two occasions. Chapa told Mackey that the slurs he used were racist and that she felt that they were made against her own family. Mackey admitted in his deposition that he used racial and ethnic slurs.

Mackey was responsible for approving attendance by his employees at professional development training courses away from campus. Chapa was never selected to attend any such training except for firearms training, which was required of every security officer who carried a gun on duty. Mackey says that he did not send Chapa to training because it would make it difficult to cover third shift. This was on of Chapa's principal complaints. Culverhouse requested and obtained a report showing that only male officers attended training other than firearms qualification during the period 1998-2001.

Chapa not only felt harassed and intimidated by Mackey but also felt like he singled her out. For instance, for two years Mackey refused to provide Chapa with a key to the security office, even though she was often the only officer working on third shift and despite the fact that all full-time male officers had office keys. Mackey's explanation was "I don't really have a reason. I just didn't give her one." Mackey also accused Chapa of having engaged in sex while on duty. Mackey told Chapa that he believed her partner had been one of the Gadsden police officers who regularly came onto campus. One of the officers was black. Mackey told Chapa, "You know what it looks like when a nigger talks to a white woman." In his deposition Mackey admitted making this statement.

At one point Chapa injured her foot and had to take off from work for a month. While she was off, Mackey telephoned her weekly insisting that she return to work. Chapa received a

doctor's release allowing her to return to light duty. Mackey refused to recognize the doctor's statement and instead required Chapa to resume her foot patrols with a brace on her foot. A few months later, Chapa needed to take some time off to attend to her daughter's health problems. Without provocation, Mackey threw his papers onto a file cabinet and knocked things to the floor and began yelling. Chapa left the office but returned a few minutes later to inform Mackey that she would cover a shift for another officer. In the presence of other officers, Mackey went into a rage because the batteries for the Nextel radio-phones were not being properly charged. He began screaming at Chapa and got very close to her, cursing angrily, his spittle flying into her face. Chapa tried to speak but Mackey continued yelling "f–king this and f–king that." He called Chapa a "f–king bitch" and backed her into the corner of the room, saying "You will do what I f–king tell you," and that he "didn't give a shit" what she said. Mackey admits making the latter remark and concedes that he acted improperly on that occasion.

In October 2001 Chapa first complained about Mackey's conduct to Dr. James Prucnal ("Prucnal"), GSCC's Dean for Financial and Administrative Services, and Mackey's senior supervisor. Chapa made a number of complaints to Prucnal and provided him with several memoranda which she prepared detailing Mackey's discriminatory treatment of her. At Chapa's request, Prucnal kept the information confidential and did not report Mackey's behavior to anyone. Ultimately these memoranda were provided to Valerie Richardson ("Richardson"), the Title IX coordinator for GSCC. By December, when her employment situation had not improved, she submitted a formal, written complaint to Culverhouse, the newly-appointed president of GSCC. In a conversation secretly recorded by Chapa, she told Culverhouse that Mackey acted like that to everyone in the security department which included males. Culverhouse assigned the

complaint to Richardson, who proceeded to investigate it as if it had been made under Title IX. The report of Richardson's investigation, which includes a summary of witnesses to whom she spoke, largely confirmed the complaints which Chapa made against Mackey. After receiving Richardson's report, Culverhouse interviewed Chapa and also met with Mackey. Culverhouse told Chapa that she would receive training, that Mackey would be disciplined, that she would require Mackey to attend some sort of sensitivity training, and that she would monitor Mackey's behavior to make sure he did not repeat his behavior and did not retaliate against her.

Culverhouse met with her assistant, Jim Pitchford ("Pitchford"), to discuss what discipline would be appropriate for Mackey. Pitchford told Culverhouse that he considered Mackey's conduct a very serious matter and that she should consider termination and suspension. Culverhouse decided to impose a five day suspension. Mackey and Culverhouse agreed that he would simply go off of the payroll for five days, but would continue to report to work. However, Culverhouse claims that she did not know that Mackey had continued to work during his suspension until she was asked about it in her deposition. Mackey also failed to attend sensitivity training, as directed. Culverhouse followed the meeting with a written memorandum setting forth the terms of the discipline imposed. In her memorandum, Culverhouse promised to hold a meeting with Mackey and staff "when this issue is resolved" to discuss "equitable treatment of college staff, students, and visitors regardless of their race, color, gender, or national origin." This meeting never took place.

After making the decision to discipline Mackey, Culverhouse met with Chapa. Chapa secretly recorded this meeting. In that conversation, Chapa advised Culverhouse that Mackey had changed and became nice and pleasant "to the extreme." Culverhouse told Chapa what GSCC was

willing to do in an attempt to resolve the situation. During the meeting Chapa appeared to be amiable to it with the exception that she kept saying that she needed monetary compensation. Culverhouse attempted to draw up an agreement based on their conversation and on several occasions rewrote it to make it acceptable to Chapa. Chapa was unwilling to accept Culverhouse's proposed resolution of her informal grievance because she felt the proposal was inconsistent with Culverhouse's promises made during their meetings. Chapa's attorney sent Culverhouse a letter alleging that such attempts constituted harassment and demanded that such attempts to resolve the issue stop. Chapa filed her EEOC charge against GSCC on March 4, 2002.

Around that same time, Mackey testified that Culverhouse directed him to write up a recommendation as to whether Chapa should continue to work at GSCC. After consulting with Prucnal, Mackey sent his memorandum to Culverhouse recommending termination of Chapa's employment. Mackey explained that he took that action "because of the harassment charges that she had brought up against me and the school." He characterized Chapa's performance as "mediocre at best" and supported his reasons for non-renewal by reciting issues from as long as two years before, for which no discipline was imposed upon Chapa. Upon receipt of Mackey's recommendation, Culverhouse directed Pitchford to investigate the complaints against Chapa made by Mackey. Pitchford wrote a memorandum a few days later that was entirely consistent with Mackey's March 27 recommendation, adding only that Mackey reported during Pitchford's investigation that Chapa was carrying a concealed tape recorder while on duty. This practice violated no rule or regulation of GSCC. After receiving Pitchford's memorandum in early April, Culverhouse sent a letter to Chapa advising her that her employment would be terminated effective May 10, 2002. Culverhouse contends that she did not consider Mackey's

recommendations in making her decision to not renew Chapa's employment. Culverhouse contends her decision was based on the finding that Chapa was using a concealed tape recorder and budgetary considerations. Culverhouse testified that the termination occurred at the time of year when GSCC is planning for the next budget year and deciding how many non-tenured employees it could terminate. Culverhouse estimated that perhaps ten non-tenured employees were non-renewed; the number was actually only five, and only one from the security department. As of June 1, 2002, GSCC had more employees than it had on March 27, the date of Mackey's recommendation.

Analysis

Defendants first contend that Chapa's claims against GSCC, Mackey, and Culverhouse are barred by state sovereign immunity and the 11th Amendment of the Constitution. Chapa has voluntarily dismissed each and every claim as to which a sovereign immunity defense might be appropriate. This renders moot the sovereign immunity defense.

Defendants next address qualified immunity under § 1983 and Title VII. It is undisputed that the Eleventh Immunity does not bar an action under Title VII. Qualified immunity is not available to a public official when the conduct complained of violates clearly established law. *Allen v. Alabama State Bd. of Educ.*, 816 F.2d 575, 577 (11th Cir. 1987). The right to be free from workplace discrimination on the basis of race or gender is clearly established law. Accordingly, neither of the defendants is entitled to qualified immunity as to claims of sex or race discrimination to the extent that those claims are not otherwise subject to dismissal.

Chapa asserts a claim against GSCC under Title VII to redress discrimination based on "race or color and sex or gender." Chapa claims that she was subjected to different terms and

conditions of employment than were white male employees. In her brief in opposition to defendants' motion for summary judgment, Chapa explains that this case has two aspects: (1) it is a gender discrimination case, in which Chapa claims that she was treated differently than her male counterparts, and (2) it is a hostile environment case alleging discrimination based on both race/ethnicity and sex/gender. Chapa states that her " gender discrimination case is based on disparate treatment of her because she is female". Chapa claims it is undisputed that she was never allowed to attend any training courses while male officers regularly did so. She also contends that Mackey's behavior towards her was more severe and pervasive and demeaning than as it was in relation to male officers.

A plaintiff can establish a *prima facie* case of gender discrimination by showing: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees who are not members of the plaintiff's protected class more favorably; and (4) she was qualified for the job or job benefit at issue. *Holifield v. Reno,* 115 F.3d 1555, 1561-62 (11th Cir. 1997). Once a *prima facie* case is shown:

> the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity....
> ... [The plaintiff] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255-56, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981). Rice-Lamar v. City of Ft. Lauderdale, Fla. 232 F.3d 836, 843 (11th Cir, 2000).

GSCC claims that Chapa cannot prove a *prima facie* case of unlawful discrimination regarding her failure to have continued employment at GSCC, because she cannot prove that she and the non-tenured security guards who remain were similarly situated in all relevant aspects. Specifically, Chapa was secretly recording other officers. GSCC argues that there were no other security guards employed at GSCC who were making such secret recordings. Additionally, she cannot put forth proof of any other full-time third shift officers who received such training or who allegedly had difficulty taking leave.

"In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir.) (quoting *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997)), *opinion modified by* 151 F.3d 1321 (11th Cir.1998). "The most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishments imposed." *Id.* In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *See Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir.1999) (citation omitted); *Silvera v. Orange County School Bd.* 244 F.3d 1253, 1259 (11th Cir. 2001).

If the court required the plaintiff to produce evidence of a male whose position in the security department mirrored her own in every respect, the plaintiff would most likely find that no such individual existed. Thus, in regards to Chapa's complaint that GSCC failed to provide her with training opportunities because she is female, the court concludes that all male security

guards, tenured or non-tenured, are proper comparators. Chapa has presented evidence that shows male security officers were allowed to attend training courses and that she was not allowed to attend. However, GSCC proffers a legitimate non-discriminatory business reason for this decision. GSCC claims that Chapa was not sent to training courses because it would have been a hardship on the department to find someone to cover her 10 pm. to 6 am. shift. Because Chapa has failed to rebut GSCC's legitimate non-discriminatory business reason GSCC is entitled to summary judgment on Chapa's disparate treatment claim insofar as it relates to the failure to provide Chapa training.

Chapa's disparate treatment claim as it relates to her being terminated also fails but for different reasons. Chapa claims that secretly tape recording other GSCC employees does not violate a GSCC rule or regulation. Although this may be true, Chapa has still failed to point to a similarly situated male security officer who was secretly recording other GSCC employees or even engaged in similar unprofessional conduct. Therefore, GSCC is entitled to summary judgment on Chapa's disparate treatment termination claim.

Chapa also has a claim for hostile work environment based on race/ethnicity and sex/gender. A hostile work environment claim under Title VII is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). To establish a hostile work environment claim a plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as

national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *See, e.g., Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)(applying these factors in the context of a hostile environment sexual harassment claim). The "'mere utterance of an . . . epithet which engenders offensive feelings of an employee' . . . does not sufficiently affect the conditions of employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Only when a workplace is "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe to alter the conditions of the employment and create an abusive working environment'" is the law violated. *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 65-66).

In her complaint, Chapa asserts that GSCC discriminated against her on the basis of race or color and sex and gender and "as a proximate result of the defendants' unlawful conduct . . . Chapa was subjected to different terms and conditions of employment than were white male employees . . ." Apparently her hostile work environment claim is based on Mackey's regular and repeated use of racial and ethnic slurs and the fact that her husband is of Hispanic descent. Chapa is a white female and Mackey is a white male. Chapa claims that she can be the victim of race discrimination because she found Mackey's use of racial slurs to be severely offensive enough to cause her to complain to GSCC and Mackey's supervisor. While that may be true it is only one element of a *prima facie* hostile work environment case. Chapa has not produced evidence to show that the harrasment was based on her race. GSCC is entitled to summary judgment on Chapa's hostile work environment claim based on race.

Chapa also brings a claim for hostile work environment based on gender or sex. GSCC argues that Mackey's alleged conduct does not rise to a level that could constitute a hostile work environment based on gender or sex. Early on in her employment, Chapa was asked by Mackey whether he was going to have to worry about her becoming pregnant. Chapa was also offended by Mackey's regular use of racial and ethnic slurs at work, such as "nigger," "chink," "sand monkey" and "ricehead" when referring to students and employees of GSCC. He once told Chapa that she could be fired if he saw her talking to Mitchell James, one of her black friends. He also told her it was not right for a white woman to be associating with a "nigger." Chapa told Mackey that the slurs he used were racist and that she felt that they were made against her own family. Mackey also refused to provide Chapa with a key to the security office, even though she was often the only officer working on third shift and despite the fact that all full-time male officers had office keys. Mackey's explanation was "I don't really have a reason. I just didn't give her one." Mackey also accused Chapa of having engaged in sex while on duty. Mackey told Chapa that he believed her partner had been one of the Gadsden police officers who regularly came onto campus. One of the officers was black. Mackey told Chapa, "You know what it looks like when a nigger talks to a white woman."

At one point Chapa injured her foot and had to take off from work for a month. While she was off, Mackey telephoned her weekly insisting that she return to work. Chapa received a doctor's release allowing her to return to light duty. Mackey refused to recognize the doctor's statement and instead required Chapa to resume her foot patrols with a brace on her foot. A few months later, Chapa needed to take some time off to attend to her daughter's health problems. Without provocation, Mackey threw his papers onto a file cabinet and knocked things to the floor

and began yelling. Chapa left the office but returned a few minutes later to inform Mackey that she would cover a shift for another officer. In the presence of other officers, Mackey went into a rage because the batteries for the Nextel radio-phones were not being properly charged. He began screaming at Chapa and got very close to her, cursing angrily, his spittle flying into her face. Chapa tried to speak but Mackey continued yelling "f–king this and f–king that." He called Chapa a "f–king bitch" and backed her into the corner of the room, saying "You will do what I f–king tell you," and that he "didn't give a shit" what she said. In the Title IX investigation, several male security officers stated that cursing is normal thing within the department, that Mackey's cursing and talking about tenure is just "general department conversation," and that Mackey used racial slurs in front of everyone.

In *Gupta v. Florida Bd. of Regents,* 212 F3d 571 (11th Cir. 2000), the court held,

> Although we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, *see Mendoza,* 195 F.3d at 1242, the statements and conduct must be of a sexual or gender-related nature--"sexual advances, requests for sexual favors, [or] conduct of a sexual nature," *id.* at 1245-- before they are considered in determining whether the severe or pervasive requirement is met. Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted. Title VII, as it has been aptly observed, is not a "general civility code." *Faragher,* 524 U.S. at 788, 118 S.Ct. at 2283-84.

In this case there are only a few comments that were possibly of a sexual or gender-related nature. Chapa was asked by Mackey whether he was going to have to worry about her becoming pregnant. Mackey also accused Chapa of having engaged in sex while on duty. He told Chapa that he believed her partner had been one of the Gadsden Police officers who regularly came onto campus. One of the officers was black; Mackey told Chapa, "You know what it looks like when a

nigger talks to a white woman." On one occasion he also called Chapa a "f–king bitch." Chapa has failed to show that Mackey's use of racial slurs and profanity was based on gender. Therefore, those comments are not considered in evaluating her gender harassment claim because she does not allege or attempt to prove a dual or mixed motive hostile environment aimed at white females.

To give rise to a hostile work environment claim, the harassment must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. *Gupta v. Florida Board of Regents,* 212 F.3d 571, 583 (11th Cir. 2000), *cert. denied,* 531 U.S. 1076 (2001). The environment must be one that a reasonable person would find hostile and abusive. *See Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999), *cert. denied*, 529 U.S. 1068 (2000). "In deciding whether a hostile environment was created, factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1989).

The conduct complained of here is verbal. Although obnoxious, it was not extreme or pervasive. Although the one instance where Mackey was screaming and yelling at Chapa and calling her a "bitch" was severe, that is not enough; the conduct must also be persistent. Furthermore, after being disciplined for this incident Chapa admitted that Mackey had become nice and pleasant "to the extreme." While his behavior was undoubtedly inappropriate work place behavior, it is insufficient to establish a Title VII violation. Finally, the element of Chapa's subjective perception of the conduct as being so abusive as to create a hostile work environment

is also missing. Chapa admits using vulgarity at work. Summary judgment as to Chapa's hostile work environment claim is due to be granted.

Chapa makes a claim for Equal Protection alleging that the defendants violated her rights under the Equal Protection Clause of the 14th Amendment to the Constitution. Defendants claim that plaintiff's attempts to address claims pursuant to § 1983 fail because she failed to plead § 1983. Specifically, Chapa only mentions § 1983 on one occasion under the "Jurisdiction" section of her complaint. It is necessary to note that § 1983 creates no substantive rights; it merely creates a remedy for deprivations of federal constitutional and statutory rights. *Almand v. Dekalb County,* 103 F.3d 1510, 1512 (11th Cir.1997). In this case, the source of plaintiffs' substantive rights is the Equal Protection Clause of the Fourteenth Amendment. *City of Hialeah, Fla. v. Rojas,* 311 F.3d 1096, 1103 (11th Cir., 2002). The framework traditionally applied to Title VII claims also applies to claims for violations of the Equal Protection Clause. *Lee v. Conecuh County Bd. of Educ.*, 634 F.2d 959, 962 (5th Cir. 1981); *Smith v. Alabama Department of Corrections,* 145 F. Supp.2d 1291, 1298 (M.D. Ala. 2001). In order to prevail in an Equal Protection claim, plaintiff must establish that the defendant treated the plaintiff unequally from similarly situated employers. *Strickland v. Alderman,* 74 F.3d 260, 264 (11th Cir. 1996). As previously stated, Chapa has failed to produce evidence that she was treated differently because of her gender and failed to rebut the defendants' legitimate business reasons for each employment decision. Thus, her Equal Protection claim also fails.

Chapa also brings a claim for retaliation. To succeed Chapa must show that (1) she engaged in a statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse employment action was causally related to the plaintiff's protected activities. *See Little v.*

*United Technologies, Carrier Transicold Div.*, 103 F.3d 956 (11th Cir. 1997). GSCC does not dispute that Chapa engaged in a statutorily protected activity and that an adverse employment action occurred. GSCC denies, however, that there is any proof of any causal links between Chapa's protected activity and its employment decision. The court disagrees. There is direct proof of causal link in the deposition testimony of Mackey and his memorandum to Culverhouse recommending that Chapa's employment be terminated. The recommendation was requested by Culverhouse within days of the receipt by GSCC of Chapa's EEOC complaint. Mackey testified that Culverhouse directed him to write up a recommendation as to whether Chapa should continue to work at GSCC. After consulting with Prucnal, Mackey sent his memorandum to Culverhouse recommending termination of Chapa's employment. Mackey explained that he took that action **"because of the harassment charges that she had brought up against me and the school."** He characterized Chapa's performance as "mediocre at best" and supported his reasons for non-renewal by reciting issues from as long as two years before, for which no discipline was imposed upon Chapa. However, in the only two written evaluations of Chapa's performance which Mackey completed her job performance was rated as "good." Upon receipt of Mackey's recommendation, Culverhouse directed Pitchford to investigate the complaints against Chapa made by Mackey. Pitchford wrote a memorandum a few days later that was entirely consistent with Mackey's March 27 recommendation, adding only that Mackey reported during Pitchford's investigation that Chapa was carrying a concealed tape recorder while on duty. This practice violated no rule or regulation of GSCC. After receiving Pitchford's memorandum in early April, Culverhouse sent a letter to Chapa advising her that her employment would be terminated effective May 10, 2002.

GSCC argues that "[a]ssuming *arguendo*, the plaintiff could prove a *prima facie* case of discrimination . . .the plaintiff cannot offer any evidence that the explanation of Dr. GSCC [sic] for Chapa's termination or decisions as to seminars and leave pretexts for unlawful discrimination." Culverhouse says that she did not consider Mackey's recommendation in making her decision to not renew Chapa's employment. Culverhouse contends her decision was based on the finding that Chapa was using a concealed tape recorder and budgetary considerations. Culverhouse testified that the termination occurred at the time of year when GSCC is planning for the next budget year and deciding how many non-tenured employees it could terminate. Culverhouse estimated that perhaps ten non-tenured employees were non-renewed; the number was actually only five, and only one from the security department. As of June 1, 2002, GSCC had more employees than it had on March 27, the date of Mackey's recommendation.

Defendants also argue that assuming *arguendo* that this court holds that part of the motives that the defendants had in the termination of Chapa were due to some retaliatory motive, summary judgment is still due to be granted based on the mixed-motives defense. Chapa argues that defendants cannot used the mixed-motive defense because they failed to specifically plead it. However, the defendants did assert in the answer the following: "Defendants deny that they have retaliated against the plaintiff in regard to her employment. The defendants deny that the termination of the plaintiff in any way related to anything other than her job performance and qualifications." In *Pulliman v. Tallapoosa County Jail,* 185 F.3d 1182 (11th Cir. 1999), the Eleventh Circuit held that similar language contained in a pretrial order provided proper notice and allowed the submission of the defense to the jury. Therefore, defendants' answer and notice

in the summary judgment motion is ample notice to the plaintiff of the mixed-motive defense. Defendant's' proof in supporting their contention that Chapa was terminated for legitimate reasons is the same as the proof in asserting that defendants would have terminated Chapa even in the absence of discriminatory reasons. In *Spanier v. Morrison's Management Servs., Inc.*, 822 F.2d 975, 980 (11th Cir.1987), the court discussed the role of nondiscriminatory reasons articulated at the second stage of the typical *McDonnell Douglas* pretext case and the role those reasons play in a mixed-motives defense. The court said in the *McDonnell Douglas* context these reasons serve to suggest the absence of discriminatory motive. In the [mixed-motives] context--in which a discriminatory motive has already been found to have been a determining factor--these same reasons may serve to show that there was a mixture of legal and illegal motives and that the legal motives standing alone would have brought about the plaintiff's dismissal.

*Id.* at 980 n. 5. In either situation, the reasons--the proof--is the same. *See also Fields v. New York State Office of Mental Retardation & Developmental Disabilities,* 115 F.3d 116, 124 n. 4 (2d Cir.1997) (explaining that only difference between mixed-motives instruction and typical discrimination charge is in asking additional question of whether Defendant has established its affirmative defense that it would have taken same action in absence of impermissible reason); *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1098 n. 8 (3d Cir.1995) ("As a practical matter, the proofs required to defend this [ADEA] case under either a pretext or 'mixed-motives' theory differed little."). This case, like many mixed-motives cases, "is not grist for the summary judgment mill." *See Adler v. Madigan,* 939 F.2d 476, 479) (7th Cir.1991). The credibility of Culverhouse's testimony that her reasons for termination of Chapa's employment were (1) budgetary and (2) that Chapa secretly tape recorded conversations, together with her insistence

that she did not consider Mackey's recommendation at all in making her decision to terminate Chapa's employment are classic jury questions. Summary judgment for the defendants as to Chapa's retaliation claim is inappropriate.

Chapa also brings a claim under Title IX alleging discrimination based on gender and race. Defendants argue that such a claim would be redundant and that there is not clear basis for providing a private right under Title IX for employment discrimination. For this proposition defendants cite *Morris v. Wallace Community College-Selma,* 125 F. Supp.2d 1315 (S.D. Ala. 2001), which held "[i]n light of the weight of authority that a Title IX claim of employment discrimination may not be maintained to the extent that Title VII provides a parallel remedy, and of the plaintiff's failure to provide any support for a contrary conclusion, the Court rules that the plaintiff's Title IX claim is precluded by Title VII." The court in *Morris* was relying on other courts that have held that since Title VII provides a "carefully balanced remedial mechanism for redressing employment discrimination, and since Title IX does not clearly imply a private cause of action for damages for employment discrimination, none should be created by the courts." *See Gibson v. Hickman*, 2 F.Supp.2d 1481, 1484 (M.D.Ga.,1998). The reasoning behind those decisions was that "to hold otherwise would eviscerate Title VII's technical and administrative requirements, thereby giving plaintiffs who work at federally funded educational institutions unfettered ability to bring what are in reality Title VII sexual discrimination claims without adhering to the same rules required of every other employment discrimination plaintiff in the country." *Id.* Like the plaintiff in *Morris,* Chapa has also not provided any support for a contrary conclusion. Chapa only argues that while the Title IX claim *may* ultimately prove to be duplicative of the claims under Title VII the Court can take appropriate steps when submitting the

case to the jury to insure that there is not a "double recovery." Chapa's Title IX claim is based on the same factual predicate as her Title VII claim. Therefore, the court agrees that Chapa's Title IX claim is precluded by her Title VII claim.

Chapa makes claims for violations of her freedom of speech and freedom of association rights under the First Amendment to the Constitution of the United States. Chapa alleges that she spoke out about a matter of public concern, "to wit, discrimination in employment based on race or color and sex or gender." The complaint does not set forth what specific speech Chapa is referring to in her claim of free speech. In reviewing her deposition, it can be assumed that the free speech was her alleged telling of Mackey that she did not like the language he used, an internal complaint which GSCC used to initiate a Title IX investigation, and/or perhaps, the filing of the EEOC complaint. Defendants argue that Chapa's claim fails because she cannot prove the elements for said claim.

The Eleventh Circuit has adopted a four part test to determine whether an employee suffered free speech retaliation based on protected speech. The court stated:

> First, a court must determine whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. If so, the district court must weigh the employee's first amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. Should the employee prevail on the balancing test, the fact-finder determines whether the employee's speech played a substantial part in the government's decision to demote or discharge the employee. Finally, if the employee shows that the speech was a substantial motivating factor in the employment decision, the state must prove by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected *conduct. Morgan v. Ford,* 6 F.3d 750, 753-54 (11th Cir.1993) (quotation marks, citations, brackets, and ellipsis omitted), *cert. denied,* 512 U.S. 1221, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994). "The threshold question of whether an employee's speech may be fairly characterized as constituting speech on a matter of public concern is a question of law, subject to *de novo* review by this court."

*Deremo v. Watkins,* 939 F.2d 908, 910 (11th Cir.1991).

> For an employee's speech to rise to the level of public concern, it must relate to a matter of political, social, or other concern to the community. Therefore, this court must determine whether the purpose of Watkins's speech was to raise issues of public concern or to further her own private interest. *Morgan,* 6 F.3d at 754. In making this determination, we consider the content, form, and context of the employee's statements, the employee's attempts to make the concerns public, and the employee's motivation in speaking. *See Morgan,* 6 F.3d at 754; *Deremo,* 939 F.2d at 910-11.

*Watkins v. Bowden*, 105 F.3d 1344, 1352 -1353 (11th Cir,1997).

Chapa's speech did not constitute speech on a matter of public concern. In *Watkins,* as in the instance case, the plaintiff's speech involved complaints lodged privately, not in a public forum. At first Chapa lodged her complaints to Prucnal privately and informally, and those complaints focused primarily on how Mackey's behaved toward her and how that conduct affected her work. She asked him to keep the complaints confidential and stated that she would try to work things out between her and Mackey. Chapa claims that the complaints were lodged in a public forum because she filed a EEOC complaint and an informal Title IX complaint. The plaintiff in *Watkins* also filed a EEOC complaint and it was insufficient to raise the speech to a matter of public concern. Futhermore, like the plaintiff in *Watkins,* Chapa's expression of concern over Mackey's treatment of her was made in her capacity as employee, rather than in her "role as citizen. *See Kurtz v. Vickrey,* 855 F.2d 723, 727 (11th Cir.1988). Thus, summary judgment is due to be granted on this claim.

Chapa's freedom of association claim is based on her association with her husband who is of Hispanic descent, her association with an African-American friend who visited her while she

was working and her association with an African-American police officer in the Gadsden Police Department who visited her during her shift. In *McCabe v. Sharrett,* 12 F.3d 1558 (11th Cir. 1994), the Eleventh Circuit held the following:

> In order for a public employee to establish that an employer conditioned his or her job in a way that burdened impermissibly a constitutional right, the employee must first demonstrate that the asserted right is protected by the Constitution and that he or she suffered "adverse employment action" for exercising the right. *See, e.g., Goffer v. Marbury,* 956 F.2d 1045, 1049 & n. 1 (11th Cir.1992). Upon making these two showings, the employee is entitled to prevail if the adverse employment action was taken in such a way as to infringe the constitutionally protected right. *See generally Branti,* 445 U.S. 507, 100 S.Ct. 1287; *Rankin,* 483 U.S. 378, 107 S.Ct. 2891.
>
> For a public employee to establish that an adverse employment action has infringed a constitutional right, the employee must first demonstrate that the asserted right is protected by the Constitution. According to Supreme Court precedent, the United States Constitution accords special protection to two different forms of association, "intimate association" and "expressive association." *See Roberts v. United States Jaycees,* 468 U.S. 609, 617-18, 104 S.Ct. 3244, 3249-50, 82 L.Ed.2d 462 (1984); *City of Dallas v. Stanglin,* 490 U.S. 19, 23-25, 109 S.Ct. 1591, 1594-95, 104 L.Ed.2d 18 (1989). *Roberts* teaches that the right of intimate association--the freedom to choose to enter into and maintain certain intimate human relationships--is protected from undue governmental intrusion as a fundamental aspect of personal liberty. *Roberts,* 468 U.S. at 617-20, 104 S.Ct. at 3249-51. At a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family--marriage, childbirth, the raising and education of children, and cohabitation with one's relatives. *Id.* at 619, 104 S.Ct. at 3250. Whether the right extends to other relationships depends on the extent to which those attachments share the qualities distinctive to family relationships, such as "relative smallness" and "seclusion from others in critical aspects of the relationship." *Id.* at 620, 104 S.Ct. at 3250. The right of expressive association--the freedom to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion--is protected by the First Amendment as a necessary corollary of the rights that the amendment protects by its terms. *Id.* at 617-18, 622, 104 S.Ct. at 3249, 3252. Both the intimate and the expressive association rights are considered fundamental. *See, e.g., id.* at 617-19, 622-29, 104 S.Ct. at 3249-50, 3252-55; *Hatcher v. Board of Public Education,* 809 F.2d 1546, 1558 (11th Cir.1987).

*McCabe v. Sharrett* 12 F.3d 1558, 1562 -1564 (11th Cir., 1994).

A plaintiff like Chapa can obtain special protection for an asserted associational right only if she can demonstrate either that the asserted association closely enough resembles a family relationship to be protected by the right to intimate association, or that the purpose of the association is to engage in activities independently protected by the First Amendment. Clearly Chapa's right to be married, is a freedom of association right entitled to special constitutional protection. To argue otherwise would be unreasonable, since *Roberts* explicitly states that the right to be married falls within the scope of the constitutional right of intimate association. *See Roberts* at 619, 104 S.Ct. at 3250. Moreover, it is well established that the right to marriage, like other intimate association rights, is fundamental. *Zablocki v. Redhail,* 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978); *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967). However, Chapa has not demonstrated that her right to have "friendly relationship with other race persons on the GSCC campus" falls within the scope of constitutional rights of freedom of association.

For a public employee to establish that an employment action has infringed a constitutional right the employee also must demonstrate that he or she has suffered some sort of adverse employment action for exercising the right. "Adverse employment action" is broadly defined and as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands. *See Goffer,* 956 F.2d at 1049 n. 1; *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Chapa has not produced evidence that she suffered adverse employment action. In fact, Chapa states that "[a]lthough Mackey never took any formal disciplinary action against Chapa for her exercise of free association, the evidence is clear

that he was displeased about, and on the lookout for Chapa having what he considered to be improper contacts with other race-persons." Defendants are entitled to summary judgment as to Chapa's First Amendment claims.

Chapa also asserts against Mackey an invasion of privacy claim. Alabama recognizes a cause of action for invasion of privacy which adopts the four elements of the *Restatement (Second) of Torts,* § 652B. *Norris v. Moskin Stores, Inc.,* 132 So.2d 321 (Ala. 1961). Alabama's version of the tort encompasses four distinct wrongs: (1) the wrongful intrusion upon the plaintiff's physical solitude or seclusion, (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false light, but not necessarily defamatory, position in the public eye; and (4) the appropriation of some element of the plaintiff's personality for a commercial use. *Id.* Only the wrongful intrusion prong of the tort is implicated in this case. Wrongful intrusion has been defined as the "intentional interference with another's interest in his solitude or seclusion, either as to his person or his private affairs or concerns." *Hogin v. Cottingham,* 533 So.2nd 525, 531 (Ala. 1998)(quoting W. Prosser and W. Keeton, *The Law of Torts*, p. 851 (5th Ed. 1984).

The Alabama Supreme Court has stated in *Phillips v. Smalley Maintenance Services, Inc.,* 435 So.2d 705 (Ala.1983), that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Restatement (Second) of Torts* § 652B (1977). Comment c to § 652B states in a part that the defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs. The wrongful intrusion may be by physical intrusion into a place where the

plaintiff has secluded himself, by discovering the plaintiff's private affairs through wiretapping or eavesdropping, or by some investigation into the plaintiff's private concerns, such as opening private mail or examining a private bank account. *Restatement (Second) of Torts* § 652B cmt. b; *see Vernars v. Young,* 539 F.2d 966 (3d Cir.1976) (holding that invasion of privacy occurred when mail addressed to plaintiff was opened by defendant without plaintiff's consent); *see generally*, W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts,* § 117, at 854-55 (5th ed.1984); 62 Am.Jur.2d *Privacy* §§ 51-57 (1990). Further, if the means of gathering the information are excessively objectionable and improper, a wrongful intrusion may occur. See *Hogin v. Cottingham,* 533 So.2d 525 (Ala.1988) (wrongful intrusion occurs when there has been abrupt, offensive, and objectionable prying into information that is entitled to be private).

Chapa asserts that her entitlement to physical solitude and seclusion extends to the solitude of her person. She claims that by "standing face-to-face with her, only inches from her person, cursing and spewing his spittle in her face, Mackey invaded Chapa's physical solitude." Mackey argues that his actions did not amount to an actionable claim of invasion of privacy under Alabama law. The court agrees, athough the spittle makes it a close question. This single isolated non-physical incident falls short of that required to constitute the tort of wrongful intrusion. Summary judgment is due to be granted as to this claim.

**Conclusion**

By separate order, the court will partially grant and partially deny defendants' motion for summary judgment.

DONE this 12th day of June, 2003.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE